UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MATTHEW MOEBIUS,
        Plaintiff,


        V.                                      CIVIL ACTION NO.
                                                15-10751-MBB

THARPEROBBINS COMPANY,
        Defendant.


**MEMORANDUM AND ORDER RE:**
**DEFENDANT THARPEROBBINS COMPANY'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 40)**

**November 1, 2016**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment filed by defendant TharpeRobbins Company ("TharpeRobbins" or "defendant"). (Docket Entry # 40). Plaintiff Matthew Moebius ("plaintiff") opposes the motion. (Docket Entry # 51). After conducting a hearing, this court took the motion (Docket Entry # 40) under advisement.

PROCEDURAL BACKGROUND

On March 10, 2015, defendant filed a notice of removal pursuant to 28 U.S.C. §§ 1332, 1441(a) and 1446. (Docket Entry # 1). Federal jurisdiction is based on the parties' diversity of citizenship under 28 U.S.C. § 1332(a), as plaintiff is a citizen of Massachusetts, defendant is incorporated in North

Carolina and the amount in controversy exceeds $75,000.  (Docket Entry # 1).

Plaintiff filed a second amended complaint (Docket Entry # 31) on September 25, 2016 setting out the following claims: wrongful termination in violation of public policy (Count I);[1] disability discrimination in violation of Massachusetts General Laws chapter 151B ("chapter 151B"), section 4 (Count II); and disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 (Count III). (Docket Entry # 31).

On October 8, 2015, defendant filed an answer to the second amended complaint.  (Docket Entry # 32).  In the answer, defendant set out the following counterclaims against plaintiff: misappropriation of trade secrets in violation of Massachusetts General Laws chapter 93, section two (Count I); misappropriation of trade secrets (Count II); conversion (Count III); breach of contract (Count IV); violation of Massachusetts General Laws chapter 93A for unfair and deceptive practices (Count V); and violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701 et seq. (Count VI).

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of

---

[1]    The parties stipulated to the dismissal of Count I.  (Docket Entry # 39).

2

the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Tobin v. Federal Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)).  It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'"  Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014)).  The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor.  Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a summary judgment motion, a court may examine "all of the record materials on file," Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014), "including depositions, documents, electronically stored information, affidavits or declarations . . . or other material."  Fed.R.Civ.P. 56(c)(1); see Ahmed v. Johnson, 752

F.3d at 495.  "Unsupported allegations and speculation,"
however, "do not demonstrate either entitlement to summary
judgment or the existence of a genuine issue of material fact
sufficient to defeat summary judgment." Rivera-Colon v. Mills,
635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing,
Corp., 747 F.3d 37, 40 (1st Cir. 2014) ("allegations of a merely
speculative or conclusory nature are rightly disregarded").

Defendant filed a LR. 56.1 statement of undisputed facts.
Uncontroverted statements of fact in the LR. 56.1 statement
comprise part of the summary judgment record.[2]  See Cochran v.
Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's
failure to contest date in LR. 56.1 statement of material facts
caused date to be admitted on summary judgment); Stonkus v. City
of Brockton School Department, 322 F.3d 97, 102 (1st Cir. 2003).
Adhering to this framework, the record sets out the following
facts.[3]

## FACTUAL BACKGROUND

The TharpeRobbins Company, now known as Engage2Excel,
Inc., is in the business of providing employee recognition
programs to assist employers in measuring, managing and

---

[2]  Statements of law in the statement of undisputed facts are not
considered.

[3]  Additional facts are included in the discussion section where
relevant to a particular argument.  Allegations in the factual
background are noted as such and are not considered facts for
purposes of the summary judgment motion.

improving the performance of their employees.  (Docket Entry #
42, ¶ 1) (Docket Entry # 52, ¶ 1).  Through such programs,
TharpeRobbins provides employers with service and performance-
based rewards for their employees.  (Docket Entry # 42, ¶ 1)
(Docket Entry # 52, ¶ 1).  In providing such employee
recognition programs, TharpeRobbins obtains and manages
electronically stored personnel and business data for its
employer clients.  (Docket Entry # 42, ¶ 2) (Docket Entry # 52,
¶ 2).  TharpeRobbins utilizes proprietary software to provide
its clients with a role-based platform, which the clients may
access from the Internet through a cloud-based portal.  (Docket
Entry # 42, ¶ 2) (Docket Entry # 52, ¶ 2).  For such data-based
employee recognition programs to be successful, it is essential
that the electronically stored personnel and business data be
kept confidential and secure.  (Docket Entry # 42, ¶ 2) (Docket
Entry # 52, ¶ 2).

    Since 2007 and at all times pertinent to this action, Neal
Cao ("Cao") has been employed as TharpeRobbins' chief
information officer.  (Docket Entry # 42, ¶ 3) (Docket Entry #
52, ¶ 3).  Cao's responsibility was to manage information
technology, including applications, development, network
infrastructure and security, and TharpeRobbins' business systems
at its facilities in Attleboro, Massachusetts and Statesville,
North Carolina.  (Docket Entry # 42, ¶ 3) (Docket Entry # 52, ¶

3).  In that capacity, Cao supervised the information technology ("IT") teams and the team members individually in both Attleboro and Statesville including plaintiff who at all times relevant worked at the Attleboro office.  (Docket Entry # 42, ¶¶ 4, 6) (Docket Entry # 52, ¶¶ 4, 6) (Docket Entry # 54-4, p. 6).[4]

A.  Plaintiff's Employment with TharpeRobbins

When Cao joined TharpeRobbins, plaintiff was TharpeRobbins' director of network infrastructure services and had worked at TharpeRobbins' Attleboro facility for approximately seven years. (Docket Entry # 42, ¶ 5) (Docket Entry # 52, ¶ 5).  As TharpeRobbins' director of network infrastructure, plaintiff developed the software and network infrastructure that TharpeRobbins used for its employees and clients.  (Docket Entry # 42, ¶ 6) (Docket Entry # 52, ¶ 6).  Plaintiff's duties included managing four employees, managing the network infrastructure security and maintaining the operation of the IT systems in both Attleboro and Statesville.  (Docket Entry # 42, ¶ 6) (Docket Entry # 52, ¶ 6).  Plaintiff was responsible for the switches, firewalls, desktops, servers, help desk, data center and security.  (Docket Entry # 42, ¶ 6) (Docket Entry # 52, ¶ 6).  Plaintiff reported directly to Cao and Cao had input as to all the work which plaintiff completed, including tasks

---

[4]  Page numbers refer to the page number of the docketed filing and not to the page number of the deposition or filing itself.

with respect to security and network infrastructure.  (Docket Entry # 54-4, p. 6).

For several years, plaintiff's job performance was good. (Docket Entry # 42, ¶ 7) (Docket Entry # 52, ¶ 7).  He worked long hours to build and maintain the network infrastructure and he assisted TharpeRobbins' employees with software and system issues.  (Docket Entry # 42, ¶ 7) (Docket Entry # 52, ¶ 7).  As proof of this, Cao nominated plaintiff for a TharpeRobbins' employee of the year award in 2011, which plaintiff received. (Docket Entry # 42, ¶ 7) (Docket Entry # 52, ¶ 7).  In March 2013 and February 2014, Cao gave plaintiff good employee reviews, recognizing his superior knowledge as to technology and other skills.  (Docket Entry # 54-4, pp. 74-80).

Plaintiff held the position of director of network infrastructure services until June 2, 2014, when his title was changed to senior network engineer because defendant hired Richard T. Onorato ("Onorato") as TharpeRobbins' director of network infrastructure.  (Docket Entry # 42, ¶ 5) (Docket Entry # 52, ¶ 5).  Before defendant hired Onorato, plaintiff reported directly to Cao; after the hiring of Onorato, plaintiff reported directly to Onorato.  (Docket Entry # 42, ¶ 5) (Docket Entry # 52, ¶ 5).  Plaintiff's managerial responsibilities were relinquished after June 2, 2014 and all such responsibilities were given to Onorato.  (Docket Entry # 53, ¶¶ 8, 37).

B.  <u>Plaintiff's Job Performance</u>

Beginning in late 2013 and continuing through 2014, plaintiff attests that he began taking more days off due to feelings of depression, which he claims worsened as a result of divorcing his wife and a fear of losing the relationship with his only son.  (Docket Entry # 53, ¶¶ 2-3).  The days which he was taking off were covered by paid time off ("PTO") that plaintiff had accumulated during his time working for defendant.  (Docket Entry # 54-4, p. 42).  Cao agreed that plaintiff "wasn't taking any absences for which he didn't have PTO already allocated."  (Docket Entry # 54-4, p. 42).

Cao stated that prior to this time toward the end of 2013, plaintiff's attendance was not in question.  (Docket Entry # 54-4, p. 34).  According to defendant, however, plaintiff's performance began to decline toward the end of 2013 and the beginning of 2014; one example of which was his failure to fully implement a new web application firewall.  (Docket Entry # 45, ¶ 12).  Plaintiff attests that the firewall was fully installed but had software issues which the designer could not resolve.  (Docket Entry # 53, ¶ 6).  Other than this, plaintiff completed all his objectives for 2013.  (Docket Entry # 54-4. pp. 24-25).  Cao acknowledges that failure to install this application on time had no adverse consequences on TharpeRobbins.  (Docket Entry # 54-4. p. 24).

As plaintiff's supervisor, it was Cao's job to set the objectives and assign work to plaintiff for the year.  In 2014, those objectives could not be met because Cao asked plaintiff to prioritize other tasks such as troubleshooting the file server replication and evaluating the network infrastructure reliability and security.  (Docket Entry # 54-4. p. 25).  Cao asked plaintiff to prioritize tasks such as these over his objectives because they were more urgent.  (Docket Entry # 54-4. p. 25).

Cao attests that on several occasions in late 2013 and early 2014 he told plaintiff that he wanted him to be more present at the facility instead of working from home because it was necessary to manage his team members and maintain the computer servers.  (Docket Entry # 45, ¶ 13).  Plaintiff, however, attests that he told Cao on more than two occasions, once in November 2013 and again in summer and spring 2014, that he needed to work from home because of his severe depression. (Docket Entry # 53, ¶ 3).  Cao was aware that plaintiff was going through a divorce and admits that he noticed a change in plaintiff's "health" during this time period.  (Docket Entry # 54-4, p. 43).  Plaintiff told Cao that the divorce had been the biggest personal crisis he had encountered in his life (Docket Entry # 54-4, p. 41) and Cao knew that plaintiff had taken "mental days" off.  (Docket Entry # 54-4, p. 44).

Despite suffering from depression, plaintiff attests that he worked over 100 hours from home some weeks. (Docket Entry # 53, ¶ 8). Plaintiff also states that there was no work that he could not do from home, though Cao believed that plaintiff's absences hindered his ability to effectively manage his team and maintain the computer servers. (Docket Entry # 45, ¶ 13). Because of this concern that plaintiff's work performance was deteriorating, Cao decided to hire Onorato, an IT professional with whom Cao had worked at a previous employer. (Docket Entry # 54-4, p. 45).

On May 27, 2014, Cao met with plaintiff to advise him of staffing changes in the department. Cao told plaintiff that beginning June 2, 2014 he would have the title of senior network engineer and report to Onorato and that the change in his title would not affect his compensation. (Docket Entry # 42, ¶ 7) (Docket Entry # 52, ¶ 7). Plaintiff did not object to the change in job title, nor did he complain that the job change was in any way discriminatory. (Docket Entry # 42, ¶ 16) (Docket Entry # 52, ¶ 16). Beginning on June 2, 2014 and continuing until his termination on September 2, 2014, plaintiff reported directly to Onorato. (Docket Entry # 42, ¶ 17) (Docket Entry # 52, ¶ 17). As Onorato was now plaintiff's direct supervisor, Cao allowed Onorato to address any issues that arose with plaintiff. (Docket Entry # 42, ¶ 17) (Docket Entry # 52, ¶ 17).

In June and July 2014, Onorato observed that plaintiff, whose cubicle was immediately adjacent to Onorato's office, was frequently absent from the Attleboro facility and often unavailable.  (Docket Entry # 42, ¶ 18) (Docket Entry # 52, ¶ 18).  Onorato kept a contemporaneous log of his interactions with plaintiff in which he detailed his absences from work. (Docket Entry # 42, ¶ 18) (Docket Entry # 52, ¶ 18) (Docket Entry # 44-1).  The log details numerous instances in June 2014 when plaintiff was late returning from lunch, failed to return after lunch, or left work early.  (Docket Entry # 42, ¶ 19) (Docket Entry # 52, ¶ 19) (Docket Entry # 44-1).

On several occasions, Onorato counseled plaintiff about his absences from the office.  (Docket Entry # 42, ¶ 19) (Docket Entry # 52, ¶ 19).  In a meeting on June 18, 2014, Onorato told plaintiff that he needed him in the office Monday through Friday eight hours a day because plaintiff's presence was critical to the success of the team.  (Docket Entry # 42, ¶ 19) (Docket Entry # 52, ¶ 19).  Despite Onorato's counseling, plaintiff's attendance problems persisted.  (Docket Entry # 42, ¶ 19) (Docket Entry # 52, ¶ 19).  For example, on June 20, 2014, plaintiff failed to return to work after lunch, saying he drank too much coffee.  (Docket Entry # 42, ¶ 20) (Docket Entry # 52, ¶ 20).  On June 27, 2014, he took the day off without advance notice or permission.  (Docket Entry # 42, ¶ 20) (Docket Entry #

52, ¶ 20).  On July 2, 2014, he was an hour late for work.
(Docket Entry # 42, ¶ 20) (Docket Entry # 52, ¶ 20).  On July 7,
2014, plaintiff took a personal day off without advance notice
or permission.  (Docket Entry # 42, ¶ 20) (Docket Entry # 52, ¶
20).  On July 9, 2014, plaintiff emailed Onorato at lunch, said
he had a flat tire and did not return until after 3:00 p.m.  On
July 11, 2014, plaintiff left at lunch and returned only after
Onorato asked him to come back to the office, arriving at 3:20
p.m.[5]  (Docket Entry # 42, ¶ 20) (Docket Entry # 52, ¶ 20).  On
July 14, 2014, Onorato met with plaintiff again to discuss
plaintiff's poor attendance.  (Docket Entry # 42, ¶ 21) (Docket
Entry # 52, ¶ 21).  Onorato explained to plaintiff that he was
not satisfied with plaintiff's attendance and requested a
greater commitment.  (Docket Entry # 42, ¶ 21) (Docket Entry #
52, ¶ 21).  Following this meeting, plaintiff's attendance
improved for a few weeks, but began to slip again in August 2014
while Onorato was on vacation.  (Docket Entry # 42, ¶ 21)
(Docket Entry # 52, ¶ 21).

C.  Data Server Crash

---

[5]  By not raising a hearsay objection, plaintiff waived the issue
solely for purposes of the summary judgment motion.  See Coons
v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010)
("district court was 'free to disregard' the state law argument
that was not developed in Coons' brief"); see, e.g., Franks v.
Indian Rivers Mental Health Center, 2012 WL 47366444, at *13 n.8
(N.D.Ala. Sept. 30, 2012) (finding hearsay objection waived on
summary judgment).

Early on Wednesday, August 13, 2014, two servers that store the electronic data for TharpeRobbins' customers crashed. (Docket Entry # 42, ¶ 22) (Docket Entry # 52, ¶ 22). Plaintiff called Onorato early that morning to inform him that the servers had crashed and were inoperable. (Docket Entry # 42, ¶ 22) (Docket Entry # 52, ¶ 22). This crash occurred when plaintiff was updating the servers from his home. (Docket Entry # 42, ¶ 23) (Docket Entry # 52, ¶ 23). Plaintiff attests that this problem occurred because of an unanticipated problem as to the update resulting from an outside bug. (Docket Entry # 53, ¶ 23). Plaintiff attests that he had never seen such a bug during his career in the technology area. (Docket Entry # 53, ¶ 23).

Typically, a crash like this can be resolved within six hours if the encryption keys and backup files are available. (Docket Entry # 53, ¶ 36). However, when plaintiff went to retrieve the backup files and encryption keys, he discovered that the keys were not in the appropriate location. (Docket Entry # 53, ¶ 27). Using the Recuva program, plaintiff determined that John Haigh ("Haigh"), an IT employee who was in charge of monitoring the backup files and encryption keys, was the reason the files disappeared although Haigh denied having deleted the backup files and encryption keys. (Docket Entry # 54-3, pp. 34-35) (Docket Entry # 53, ¶¶ 29-31). Recuva allowed plaintiff to show the backup files in place and to see where the

files had previously been stored.  (Docket Entry # 53, ¶ 29).
The information provided by Recuva indicated that the files had
existed on July 16, 2014, which was seven weeks after Onorato
had been hired.  (Docket Entry # 53, ¶ 31).  Plaintiff believes
that Haigh deleted the backup files in July as part of the
installation of an update.  (Docket Entry # 53, ¶ 35).

On Friday, August 15, 2014, plaintiff was still working
from home to restore the systems and was unable to find the
critical backup file for the SQL database which was needed to
finish restoring the system.  (Docket Entry # 42, ¶ 27) (Docket
Entry # 52, ¶ 27).  When plaintiff told Onorato that he could
not find the SQL database backup file, Onorato called plaintiff
and asked him to come into the office to work together to find
the file for the SQL database.  (Docket Entry # 42, ¶ 27)
(Docket Entry # 52, ¶ 27).  Later that day, on August 15, 2014,
plaintiff came into the office and, together with Onorato, was
able to find the SQL database backup file and restore the
systems at which point the servers became operational.  (Docket
Entry # 42, ¶ 27) (Docket Entry # 52, ¶ 27).

Although the crash of the servers placed defendant out of
business for two days and at a considerable risk, defendant did
not experience any loss of revenue or clients.  (Docket Entry #
42, ¶ 28) (Docket Entry # 52, ¶ 28) (Docket Entry # 54-4, pp.
35-36).  However, had the backup files not been found, defendant

could have lost all of the data in its system permanently.
(Docket Entry # 53, ¶ 38).

D.   <u>Termination</u>

In late August of 2014, Onorato determined that plaintiff
should be terminated because Onorato believed that plaintiff
caused the server outage, failed to locate the encryption keys
and failed for more than two days to locate the backup data
necessary to restore the system, thereby egregiously putting the
company at risk.   (Docket Entry # 42, ¶ 30) (Docket Entry # 52,
¶ 30).   Onorato decided that this conduct constituted grounds
for terminating plaintiff's employment and he so informed his
supervisor, Cao, and TharpeRobbins' senior vice president for
talent, Susan Tolle ("Tolle").   (Docket Entry # 42, ¶ 30)
(Docket Entry # 52, ¶ 30).   Cao and Tolle supported Onorato's
decision to terminate plaintiff's employment for unsatisfactory
performance, culminating in his failure to restore the servers
after the crash on August 13, 2014.   (Docket Entry # 42, ¶ 34)
(Docket Entry # 52, ¶ 34).   Although Onorato had the authority
to terminate plaintiff directly, Cao agreed to deliver the news
of the termination to plaintiff on September 2, 2014.   (Docket
Entry # 54-4, pp. 33-34).

While plaintiff concedes that he did not disclose his
severe depression to Onorato (Docket Entry # 42, ¶ 31) (Docket
Entry # 52, ¶ 31), plaintiff attests to previously informing Cao

of his depression when Cao was plaintiff's direct supervisor
(Docket Entry # 54-4, pp. 45-46) (Docket Entry # 54-1, p. 18).
At no point after the termination did plaintiff attribute his
job performance problems to depression or disability, nor did he
complain to Tolle, Cao or Onorato of discrimination based on
alleged depression or disability.  (Docket Entry # 42, ¶ 36)
(Docket Entry # 52, ¶ 36).  Onorato was only made aware of
plaintiff's depression after plaintiff submitted a complaint to
the Massachusetts Commission Against Discrimination ("MCAD") in
July 2015.  (Docket Entry # 42, ¶ 31) (Docket Entry # 52, ¶ 31).

E.   Defendant Brings Counterclaim for Misappropriation

     On or about December 4, 2014, Brett Tharpe, who was
TharpeRobbins' chief executive officer, received a letter dated
December 3, 2014 from Christopher J. Trombetta, Esq., an
attorney representing plaintiff, asserting for the first time
that plaintiff had been terminated in violation of Massachusetts
public policy for refusing to make false representations to
clients.  (Docket Entry # 42, ¶ 38) (Docket Entry # 52, ¶ 38).
Attached to this letter were copies of confidential
TharpeRobbins documents, including a confidential email from Cao
to other members of TharpeRobbins' leadership team.  (Docket
Entry # 42, ¶ 39) (Docket Entry # 52, ¶ 39).  Defendant filed
the counterclaim alleging that plaintiff could only have
obtained such an email if he accessed Cao's or another

employee's email, which plaintiff had the ability to do.
(Docket Entry # 45, ¶ 33).   Accessing another employee's email
would have been a violation of TharpeRobbins policy.  (Docket
Entry # 45, ¶ 34).   Furthermore, a confidentiality agreement
signed by plaintiff required him to return all TharpeRobbins
confidential business documents and client information to
TharpeRobbins upon termination.  (Docket Entry # 45, ¶ 34).

Plaintiff states that a physical copy of the email was
given to him by Cao sometime in July 2015 when plaintiff was
still employed by defendant on an occasion when he went to see
Cao in Cao's office at Cao's request.  (Docket Entry # 46-1, pp.
63-64).   TharpeRobbins notes that when it requested, through its
attorney, that plaintiff return all confidential documents,
plaintiff refused to return them.  (Docket Entry # 45, ¶ 34)
(Docket Entry # 46-1, pp. 11-13).

V.   <u>Plaintiff's Allegation of Disability Discrimination</u>

Plaintiff filed and served both a complaint and an amended
complaint alleging that plaintiff had been fired in violation of
Massachusetts public policy for his failure to make false
representations to clients.  (Docket Entry # 42, ¶ 42) (Docket
Entry # 52, ¶ 42).   Neither the original nor the first amended
complaint alleged discrimination on the basis of a disability.
(Docket Entry # 42, ¶ 42) (Docket Entry # 52, ¶ 42).   On or
about July 21, 2015, TharpeRobbins received notice from the MCAD

of the complaint filed by plaintiff.  In the MCAD complaint,
filed June 16, 2015, plaintiff alleged that he was discriminated
against on the basis of disability.  (Docket Entry # 42, ¶ 43)
(Docket Entry # 52, ¶ 43).

As TharpeRobbins' senior vice president for talent, Tolle
was responsible for compiling and issuing the TharpeRobbins
employee handbook.  (Docket Entry # 42, ¶ 45) (Docket Entry #
52, ¶ 45).  At her direction, TharpeRobbins issued a new
employee handbook in 2013 and copies were distributed to all
employees, including plaintiff.  Plaintiff signed a handbook
acknowledgment form, acknowledging his receipt of the handbook
on May 23, 2013.  (Docket Entry # 42, ¶ 45) (Docket Entry # 52,
¶ 45).

The employee handbook states that TharpeRobbins is an equal
opportunity employer.  (Docket Entry # 54-1, p. 17) (Docket
Entry # 43, ¶ 4).  As stated in the employee handbook's equal
opportunity policy, TharpeRobbins prohibits discrimination on
the basis of disability, as well as other protected categories,
in all facets of employment.  (Docket Entry # 54-1, p. 17)
(Docket Entry # 43, ¶ 4).  The policy states that any employee
who believes that he or she has been discriminated in violation
of the policy should immediately talk with his or her
supervisor, the talent department, or any member of the

leadership team.  (Docket Entry # 54-1, p. 17) (Docket Entry # 43, ¶ 4).

The employee handbook also contains a policy specifically regarding the "Americans with Disabilities Act/Reasonable Accommodations," which states that TharpeRobbins is "committed to working with and providing reasonable, necessary accommodations to employees with physical and/or mental disabilities."  (Docket Entry # 54-1, p. 18) (Docket Entry # 42 ¶ 47) (Docket Entry # 52 ¶ 47).  The policy encourages employees to provide their supervisors with information on any limitations or restrictions in performing the essential duties of their positions.  (Docket Entry # 54-1, p. 18) (Docket Entry # 43, ¶ 5).  The company's "open door policy" provides that any employee who has a problem or question concerning his or her job should first talk it over with his or her immediate supervisor, someone on the leadership team, or a member of the talent department. The policy states:  "The door is always open for communication concerning both personal and work-related concerns."  (Docket Entry # 54-1, p. 19) (Docket Entry # 43, ¶ 6).

Tolle was familiar with plaintiff and had several conversations with him during his employment at TharpeRobbins. (Docket Entry # 43, ¶ 7).  In none of their conversations did plaintiff ever mention that he suffered from depression or was disabled, nor did he ever suggest a need for any accommodation.

(Docket Entry # 42, ¶ 50) (Docket Entry # 52, ¶ 50).  Cao insists that plaintiff spoke of a depression on only one occasion.  On that occasion, in about April or May 2014, plaintiff told Cao that at a young age he was diagnosed with depression and, as a result, he was still on some medication. (Docket Entry # 45, ¶ 36).  Conversely, plaintiff stated in deposition, and Cao denied, that in late 2013 or early 2014 he told Cao that he suffered from depression and it made him uncomfortable to be in the office and it was much easier for him to work from home.[6]  (Docket Entry # 46-1, pp. 25-27).  Plaintiff cites this as the reason why he was not always in the office or would leave work early.  (Docket Entry # 46-1, ¶ 43).  Cao admits to generally giving plaintiff permission to work from home when he requested it, but there were times when Cao desired plaintiff to work from the office to complete projects that required teamwork.  (Docket Entry # 46-1, pp. 34-36).  Plaintiff attests that all of these task could have been completed from home using e-mail or telephone.  (Docket Entry # 46-1, pp. 34-36).

Plaintiff admits that he never told anyone at TharpeRobbins other than Cao that he was depressed, the reason being that he wanted to keep his depression confidential.  (Docket Entry # 42,

---

[6]  This factual dispute is resolved in plaintiff's favor.

¶ 56) (Docket Entry # 52, ¶ 56).  Plaintiff testified that he
never told Onorato he was depressed.  (Docket Entry # 42, ¶ 56)
(Docket Entry # 52, ¶ 56).  Plaintiff further testified that
from January 1, 2012 through the date of his deposition,
February 22, 2016, he received treatment or counseling for
depression on only one occasion, when he sought a medication
adjustment from his personal doctor in May or June 2014.
(Docket Entry # 42, ¶ 58) (Docket Entry # 52, ¶ 58).

On November 17, 2015, TharpeRobbins served its second set
of requests for production of documents on plaintiff's attorney.
(Docket Entry # 42, ¶ 59) (Docket Entry # 52, ¶ 59).  Among
other items, the document requests sought copies of all of
plaintiff's medical, psychological and counseling records from
January 2, 2012 through the present, and all documents
supporting his claim that he is an individual with a disability
pursuant to the ADA.  (Docket Entry # 42, ¶ 59) (Docket Entry #
52, ¶ 59).  Plaintiff produced the documents in his possession
and he also provided responses to defendant's second set of
interrogatories, the answers to which describe the effects of
plaintiff's condition.  (Docket Entry # 54, ¶ 2).

On behalf of TharpeRobbins, a subpoena for documents was
served on plaintiff's purported medical provider, Glenn Tucker,
M.D. ("Dr. Tucker"), on February 26, 2016.  Dr. Tucker did not
respond to the subpoena.  (Docket Entry # 42, ¶ 60) (Docket

Entry # 52, ¶ 60).   The only medical information produced by plaintiff was a document signed by Dr. Tucker on March 20, 2014, seven months before his termination, indicating that plaintiff suffered from depression and suicidal thoughts.   (Docket Entry # 53-1, pp. 2-3).   The document lists a variety of medications prescribed for the plaintiff to alleviate the symptoms of his depression and other problems with his health such as Lexapro, Budeprion, Melatonin, Adderall, aspirin, Taclonex, Dovonex, Elidel, Cialis, Flonase and multivitamins.   (Docket Entry # 53-1, pp. 2-3).

## DISCUSSION

Disability discrimination under chapter 151B and the ADA are analyzed under the same burden shifting framework where, as here, there is no direct evidence of discrimination.   See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1312-14 (Mass. 1997); accord Sensing v. Outback Steakhouse of Fla., L.L.C., 575 F.3d 145, 153-54 (1st Cir. 2009) (noting that federal law construing ADA should be followed in interpreting Massachusetts disability law); Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 32, n.1 (1st Cir. 2001) (applying same analysis to evaluate discrimination claims brought under chapter 151B and ADA); Labonte v. Hutchins & Wheeler, 678 N.E.2d 853, n.5 (Mass. 1997) (noting that because

22

Massachusetts employee discrimination law "closely mirror[s] the [ADA]" the Massachusetts Supreme Judicial Court "look[s] toward Federal courts to see how they have addressed [the] issue"). This framework dictates that the plaintiff bears the initial burden to establish the elements of a prima facie case.  See McDonnell Douglas Corp. v. Green, 411 U.S. at 802; accord Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d at 1312-14.  The rather minimal showing functions to raise an inference of discrimination.  Tex. Dep't of Community Aff. v. Burdine, 450 U.S. 248, 253-54 (1981).

Once this inference is established, the burden of production shifts "to the employer to articulate some legitimate, non-discriminatory reason" for the employment action.  McDonnell Douglas Corp. v. Green, 411 U.S. at 802; accord Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d at 1312-14.  If this intermediary burden of production is satisfied by the defendant, the plaintiff gets a "fair opportunity to show that [the defendant's] stated reason" is pretextual.  McDonnell Douglas Corp. v. Green, 411 U.S. at 804; accord Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d at 1312-14. Accordingly, "the plaintiff bears the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  Gu v. Boston Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002) (quoting Tex. Dep't of

Community Aff. v. Burdine, 450 U.S. at 253).

I.   Prima Facie Case

"Under McDonnell Douglas Corp. v. Green, a plaintiff in a disability discrimination case must first make out a three-factor prima facie case." Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012).  "[T]he plaintiff must show that he (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) was discharged or otherwise adversely affected in whole or in part because of his disability."  Id.  Likewise, "to establish prima facie case under 151B "plaintiff must show that [he] was terminated, that [he] is 'handicapped,' that [he] is a 'qualified handicapped person,' and that [he] was terminated because of [his] handicap."  Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1060 (Mass. 2002).  "A 'qualified handicapped person' is defined under [chapter 151B] as 'a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to his handicap."  Id.; see Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 74 (1st Cir. 2010).

A.   Disabled within Meaning of ADA and Chapter 151B

24

Defendant argues that, although plaintiff has suffered from depression, plaintiff produced no evidence to show that his depression substantially limited a major life activity.  (Docket Entry # 41, pp. 11-12).  Defendant further states that Onorato, the ultimate decision maker in this case, had no knowledge of plaintiff's depression and that Cao was only told once by plaintiff of his depression.  (Docket Entry # 41, pp. 9-10).  Plaintiff contends that depression is a recognized disability.  (Docket Entry # 59, pp. 13-15).  He also argues that Cao was made aware of his severe depression which resulted from his divorce.  (Docket Entry # 59, p. 15).  Finally, plaintiff points to the employee handbook which does not require him to produce proof of his depression unless requested by his employer.  (Docket Entry # 54-1, p. 18).

The statutory definitions of "disability" under the ADA and "handicap" under chapter 151B are "essentially the same." Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 n.2 (1st Cir. 2010).  A "disability" within the meaning of the ADA is analyzed under a three-part analysis.  Velez del Valle v. Mobile Paints, 349 F.Supp.2d 219, 226 (1st Cir. 2004); City of New Bedford v. Mass. Comm'n Against Discrimination, 799 N.E.2d 578, 588-89 (Mass. 2003) (applying the same three-part test when interpreting chapter 151B).  First, the court asks if the disability is "a physical or mental impairment."  42 U.S.C. §

12102(2); Velez del Valle v. Mobile Paints, 349 F.Supp.2d at
226; accord City of New Bedford v. Mass. Comm'n Against
Discrimination, 799 N.E.2d at 588-89.  A mental impairment is
defined by ADA regulations as "any mental or psychological
disorder, such as mental retardation, organic brain syndrome,
emotional or mental illness, and specific learning
disabilities."  29 C.F.R. § 1630.2(h)(2).  Second, the court
determines whether the disability "substantially limits one or
more of the major life activities of such individual."  42
U.S.C. § 12102(2); Velez del Valle v. Mobile Paints, 349
F.Supp.2d at 226; accord City of New Bedford v. Mass. Comm'n
Against Discrimination, 799 N.E.2d at 588-89.  "Working" is
specifically included as a major life activity.  42 U.S.C. §
12102(2)(A).

   "Third, the court asks whether the 'impairment
substantially limits the activity found to amount to be a major
life activity.'"  42 U.S.C. § 12102(2); Velez del Valle v.
Mobile Paints, 349 F.Supp.2d at 226; accord City of New Bedford
v. Mass. Comm'n Against Discrimination, 799 N.E.2d at 588-89;
Boston Police Dep't v. Kavaleski, 2014 Mass. Super. LEXIS 133,
*18 (D.Mass. Aug. 14, 2014) (under third prong "we ask whether
the impairment substantially limited the major life activity").
Factors to consider in determining whether an individual is
substantially limited in a major life activity include "the

nature and severity" of the impairment, see 29 C.F.R. §
1630.2(j)(2)(i), and the expected duration of the impairment,
see 29 C.F.R. § 1630.2(j)(2)(ii).  To be substantially limiting,
"the impairment's impact must . . . be permanent or long-term."
Carroll v. Xerox Corp., 294 F.3d 231, 239 (1st Cir. 2002) (citing
29 C.F.R. § 1630.2(j)(2)(ii)-(iii)); accord Muse v. UPS, 2008
Mass.App. LEXIS 1054, *10 (Mass.App.Ct. Jan. 9, 2008) ("[l]ong-
term residual effects bolster a finding of handicap, while a
quick recovery weighs against it") (citation omitted).

    "This circuit has recognized depression as a mental
impairment that may constitute, at least in some circumstances,
a disability under federal law."  Calero-Cerezo v. United States
DOJ, 355 F.3d 6, 20 (1st Cir. 2004); Criado v. IBM Corp., 145
F.3d 437, 442 (1st Cir. 1998); see also Equal Employment
Opportunity Comm'n v. Amego, Inc., 110 F.3d 135, 141 (1st Cir.
1997) (assuming for summary judgment purposes that plaintiff's
depression and post-traumatic stress disorder rendered him "a
disabled person within the meaning of the ADA"); see, e.g.,
Pacheco v. Bentley College, 2004 Mass. Super. LEXIS 668, *19-20
(D.Mass. March 3, 2004) (defendants' summary judgment motion
denied as to former employee's claims that defendants
discriminated against her based on her chronic depression and
anxiety under chapter 151B).  Plaintiff, however, must offer
evidence showing that the depression substantially limited a

major life activity, i.e., his ability to perform the essential functions of his job.  Roman-Oliveras v. Puerto Rico Elec. Power Auth., 655 F.3d 43, 48-49 (1st Cir. 2011).  Under this framework, "'it is insufficient . . . to merely submit evidence of a medical diagnosis of an impairment.' . . . 'Rather, those seeking [chapter 151B] protection must offer evidence that 'the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'"  City of New Bedford v. Mass. Comm'n Against Discrimination, 799 N.E.2d at 589 (quoting Carroll v. Xerox Corp., 294 F.3d at 238) (citation omitted).

Here, not only did plaintiff offer a diagnosis from his doctor (Docket Entry # 53-1), but he went further by offering a sworn affidavit that his condition was severely impaired by the divorce of his wife and fear of losing the relationship with his only son.  (Docket Entry # 53, ¶ 4).  The doctor's note indicates that plaintiff was suffering from depression in March 2014, seven months before he was terminated.  (Docket Entry # 53-1).  The doctor wrote that plaintiff "agrees to go to the ER if the suicidal thoughts become more intrusive or if he starts to consider [suicide]."  (Docket Entry # 53-1).  In his affidavit, plaintiff attests that his depression caused him to lose confidence, become withdrawn, suffer from anxiety, lack

energy, have difficulty interacting with co-workers and have suicidal ideations.  (Docket Entry # 53, ¶ 4).

The fact that plaintiff was missing work because of his depression is confirmed by certain testimony in plaintiff's and Cao's depositions.  Cao admits in his deposition that in April or May 2014, plaintiff told him that at a young age he was diagnosed with depression and that he was still taking medication.  (Docket Entry # 45, ¶ 36); see Carroll v. Xerox Corp., 294 F.3d at 239 (stating that, to be substantially limiting, "the impairment's impact must . . . be permanent or long-term").  While it is true that on a few occasions Cao asked plaintiff to be in the office eight hours a day, Monday through Friday (Docket Entry # 54-3, pp. 12-13), plaintiff told Cao that when he was in "that mode because of [his] depression" he would need to work from home.  (Docket Entry # 54-3, p. 13).  Moreover, in Cao's deposition, Cao states he noticed a change in plaintiff's "health" which Cao presumed was a result of the divorce.  (Docket Entry # 54-4, p. 43).

Construing the evidence in the light most favorable to plaintiff, this court finds that the first element of the prima facie case is satisfied.  For purposes of summary judgment, plaintiff made a sufficient showing that he did in fact have a disability that significantly impaired his ability to perform his job.

B.   Reasonable Accommodation

The second element of the prima facie case under the ADA requires that plaintiff be a qualified individual who is "'able to perform the essential functions of'" his position "'with or without reasonable accommodation.'"   Phelps v. Optima Health, Inc., 251 F.3d 21, 25 (1st Cir. 2001) (quoting Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 32-33 (1st Cir. 2000)). Similarly, under chapter 151B, an employer is barred from dismissing an employee who is "capable of performing the essential functions of the position involved with reasonable accommodation."   Mass. Gen. Laws ch. 151B, § 4(16).   The inquiry is often divided "into two steps:   (1) whether the employee could perform the essential functions of the job; [and] (2) if not, whether any reasonable accommodation by the employer would enable him to perform those functions."   Ward v. Mass. Health Research Inst., Inc., 209 F.3d at 33; Phelps v. Optima Health, Inc., 251 F.3d at 25; see Dube v. Nat'l Fiber Tech., LLC, 2007 Mass. Super. LEXIS 392 (D.Mass. May 3, 2007) (plaintiff "must present credible evidence that" he "was qualified to perform essential functions of the job with or without reasonable accommodation").

1.   Essential Functions

The summary judgment facts provide sufficient evidence that plaintiff was qualified for the position because he had held the

position for a significant number of years and was knowledgeable
about the network infrastructure.  (Docket Entry # 45, ¶ 10).
He also received the employee of the year award in 2011 and was
given good employee reviews in 2012 and 2013.  (Docket Entry #
45, ¶ 10).  It is apparent that plaintiff would have been fully
capable of performing his duties from the office had he not
suffered from severe depression or had he only suffered from
mild depression.

Defendant argues that, although plaintiff was knowledgeable
in maintaining the servers, his attendance was unsatisfactory,
causing him to be unavailable in the office to attend meetings
and participate in other tasks which required team effort.
(Docket Entry # 41, p. 12).  Plaintiff contends that his
presence was not necessary because he could perform all of the
essential functions from home which he had been doing for many
years before Onorato was ever hired.  (Docket Entry # 59, pp.
16-17).

"An essential function 'is 'fundamental to a position
rather than marginal.''"  Cairo v. Starbucks Corp., 2013 WL
5229968, *8 (D.Mass. Sept. 13, 2013) (quoting Richardson v.
Friendly Ice Cream Corp., 594 F.3d at 74); 29 C.F.R. §
1630.2(n)(1) ("the term essential functions means the
fundamental job duties of the employment position the individual
with a disability holds or desires").  "Whereas an essential

31

function 'does not include marginal tasks,' it 'may encompass individual or idiosyncratic characteristics of the job.'"  Cairo v. Starbucks Corp., 2013 WL 5229968, at *8 (quoting Jones v. Nationwide Life Ins. Co., 696 F.3d at 88 (internal quotations marks and citations omitted)).  "Three nonexclusive reasons why a job function is essential are that:  '(1) the position exists for the purpose of performing the function; (2) there are a limited number of employees among whom responsibility for the function can be distributed; and/or (3) the function is highly specialized and the incumbent was hired for his or her expertise or ability to perform it.'"  Id. at *8 (quoting Richardson v. Friendly Ice Cream Corp., 594 F.3d at 75, citing ADA implementing regulation 29 C.F.R. § 1630.2(n)(2)); accord Cargill v. Harvard Univ., 804 N.E.2d 377, 385-86 (Mass.App.Ct. 2004) (applying same standard when interpreting chapter 151B).

     "A court may examine '[t]he employer's judgment as to which functions are essential.'"  Cairo v. Starbucks Corp., 2013 WL 5229968, at *9 (quoting Jones v. Walgreen Co., 679 F.3d 9, 14 (1st Cir. 2012)).  "'Employer's good faith view of what a job entails' is important although 'not dispositive' in the calculus."  Cairo v. Starbucks Corp., 2013 WL 5229968, *9 (quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2002)); see Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d at 34 ("[w]hile we generally give

substantial weight to the employer's view of job requirements in the absence of evidence of discriminatory animus, it is only one factor in the analysis") (citation omitted).  "'The consequences of not requiring the incumbent to perform the function' also provide evidence of an essential function." Cairo v. Starbucks Corp., 2013 WL 5229968, at *9 (quoting 29 C.F.R. § 1630.2(n)(3)(iv)).  Other "[e]vidence of whether a particular function is essential includes, but is not limited to:  '[t]he employer's judgment as to which functions are essential;' '[w]ritten job descriptions prepared before advertising or interviewing applicants for the job;' '[t]he work experience of past incumbents in the job;' and '[t]he current work experience of incumbents in similar jobs.'"  29 C.F.R. § 1630.2(n)(3); Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006).

In Rios-Jimenez, the court explained that, "At the risk of stating the obvious, attendance is an essential function of any job." Rios-Jimenez v. Sec'y of Veterans Affairs, 520 F.3d 31, 42 (1st Cir. 2008); see also Browning v. Liberty Mut. Ins. Co., 178 F.3d 1043, 1048 (8th Cir. 1999) ("[i]t is axiomatic that in order for [an employee] to show that [he] could perform the essential functions of [his] job, [he] must show that [he] is at least able to show up for work").  The majority view likewise posits that an employee cannot perform the essential functions of his job if he does not show up for work.  Browning v. Liberty

Mut. Ins. Co., 178 F.3d at 1048.  The circumstances in Rios-Jimenez, however, involved a plaintiff who was absent from the workplace and did not work from home during those absences. Rios-Jimenez v. Sec'y of Veterans Affairs, 520 F.3d at 35-36. The inquiry in the case at bar entails whether being present at the facility, as opposed to working at home, was one of the essential functions of the position.  See Mulloy v. Acushnet Co., 460 F.3d at 148.

In the case at bar, after Onorato was hired on June 2, 2014 as director of network infrastructure services, plaintiff was demoted to senior network engineer.  (Docket Entry # 45, ¶¶ 17-18).  From then on, plaintiff no longer had the essential function of supervising employees and he was subordinate to Onorato instead of Cao.  (Docket Entry # 53, ¶ 37).  Plaintiff retained responsibility of the servers in light of his expertise and knowledge of the network infrastructure which he created for TharpeRobbins.  (Docket Entry # 44, ¶ 15).

According to Cao's performance review of plaintiff completed in February 2014, plaintiff was fully capable of performing the essential functions of his job.  (Docket Entry # 54-4, pp. 74-80).  The performance review shows that plaintiff performed at an average level or above average level in every category except for one in which plaintiff received a below average rating with regard to his "participation in company

34

appreciation events during work and outside of work hours, as able." (Docket Entry # 54-4, pp. 77-78). There is little, if any, evidence that such participation was an essential function of his job.

In addition, plaintiff attests that he completed nearly every task assigned to him in 2013 and during the beginning of 2014, except for the web application firewall which could not be installed because of problems with the product's design which the designer could not even resolve. (Docket Entry # 53, ¶ 6). Cao admits in his deposition that any other tasks that plaintiff did not complete could have been a result of Cao giving plaintiff other tasks to prioritize over his primary objectives. (Docket Entry # 54-4, p. 25).

In sum, construing the facts in plaintiff's favor, a reasonable juror could find that plaintiff was performing the essential functions of his position and that being present in the office at all times was a marginal requirement and not an essential function of plaintiff's job.

2.  Reasonable Accommodation

Neither plaintiff nor defendant extensively address this element of the prima facie case. Defendant essentially argues that plaintiff would not be able to perform the essential functions of his job if he were permitted to work from home, which is why Onorato wanted plaintiff to be in the office eight

hours a day, Monday through Friday.  (Docket Entry # 41, p. 13).
Defendant claims that plaintiff's presence in the office was
essential to the completion of important network infrastructure
projects.  (Docket Entry # 41, p. 15).  In plaintiff's statement
of facts in his memorandum in opposition to defendant's motion
for summary judgment, plaintiff indicates that working from home
was a reasonable accommodation because it allowed plaintiff to
work longer hours and because his responsibilities concerned
only technology issues which could be addressed from his
computer.  (Docket Entry # 59, p. 5).

   "A reasonable accommodation" is one that "'enable[s] a
qualified individual with a disability to perform the essential
functions of [his] position.'"  Ward v. Massachusetts Health
Research Inst., Inc., 209 F.3d at 36 (quoting 29 C.F.R. §
1630.2(o)(ii)); accord Godfrey v. Globe Newspaper Co., Inc., 928
N.E.2d 327, 334 (Mass. 2010) ("reasonable accommodation" is one
"that will enable [employee] to perform the essential functions
of his job").  "An employer is obligated to provide a reasonable
accommodation (as long as it is not unduly burdensome) where a
protected employee has requested an accommodation or the
employer otherwise knew that one was needed."  Murray v. Warren
Pumps, LLC, 821 F.3d 77, 84 (1st Cir. 2016) (citing Jones v.
Nationwide Life Ins. Co., 696 F.3d at 89); accord Godfrey v.
Globe Newspaper Co., Inc., 928 N.E.2d at 334.

"Ordinarily, the employer's duty to accommodate is triggered by a request from the employee." Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007); accord Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d at 1066. The employee's request for an accommodation, however, "must be sufficiently direct and specific, and it must explain how the accommodation is linked to the [employee's] disability" in order to trigger the employer's responsibility to accommodate. Jones v. Nationwide Life Ins. Co., 696 F.3d at 89; see also Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 257, 270-71 (Mass. 2004).

Plaintiff submits that TharpeRobbins, knowing of his depression, should have accommodated his disability by continuing to give him the flexibility to work from home. (Docket Entry # 59, p. 15). Cao admits in his deposition that plaintiff informed him that the divorce was the worst personal crisis of his life and that, as a result of this crisis, plaintiff would need to work from home because of his severe depression. (Docket Entry # 54-4, p. 14). Cao also admits noticing plaintiff's physical condition worsening around the time of the divorce. (Docket Entry # 54-4, p. 43). Although the issue is decidedly close, when viewing the facts in plaintiff's favor this court finds these circumstances a sufficient request for an accommodation.

The inquiry therefore devolves to whether the type of accommodation plaintiff sought, i.e., working from home, was a reasonable request that was not unduly burdensome to defendant. Murray v. Warren Pumps, LLC, 821 F.3d at 84.  "An employer need not accommodate a disability by foregoing an essential function of the job."  Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir. 1998); see also Dziamba v. Warner & Stackpole LLP, 778 N.E.2d 927, 933 (Mass.App.Ct 2002) ("[t]o fulfill their obligation of a reasonable accommodation to a handicap, employers need not make substantial changes in the standards of a job"); see also Simon v. Harvard Vanguard Med. Assoc., 2015 U.S. Dist. Lexis 154911, *20 (D.Mass. Nov. 16, 2015) (stating that "in a modern wired economy, there are many jobs that can be satisfactorily performed from home").  Plaintiff "bears the burden of proving that a 'proposed accommodation would enable [him] to perform the essential functions of [his] job' and that, 'at least on the face of things, [the accommodation] is feasible for the employer under the circumstances.'"  Richardson v. Friendly Ice Cream Corp., 594 F.3d at 81.

If a job's essential function entails plaintiff interacting with customers or managing staff employees on a daily basis, something the employee cannot do from home, then obviously that employee would have to work from the office.  See Kvorjak v. Maine, 259 F.3d 48, 55-58 (1st Cir. 2001) (concluding that

permanent, full-time, work-at-home arrangement employee sought would not allow him to perform an essential function that required personal contact, interaction, and coordination with others in the workplace).

Viewing the facts in plaintiff's favor, plaintiff's request to work from home was feasible under the circumstances because plaintiff was an experienced computer engineer who was able to accomplish tasks with or without supervision.  For summary judgment purposes, plaintiff sufficiently demonstrates that the essential functions of his job could have been completed at home almost as easily as they could have been completed in the office.  (Docket Entry # 42, ¶ 23) (Docket Entry # 52, ¶ 23). Plaintiff attests that while he held the position as director of network infrastructure it was a normal practice to work from home.  (Docket Entry # 53, ¶ 18).  Notably, when defendant hired Onorato, the company took away plaintiff's managerial responsibilities leaving plaintiff with the sole duty of maintaining the network infrastructure security and reliability. (Docket Entry # 45, ¶ 12).

Cao stated in his deposition that, although plaintiff had poor attendance, he never took an absence that was not covered by PTO, which plaintiff accumulated during his employment with TharpeRobbins.  (Docket Entry # 54-4, p. 42).  Also, when plaintiff was not able to come back to the office, he always

made himself available to Onorato from home if anything came up.
(Docket Entry # 44-1, pp. 3-5).   In fact, a reasonable juror
could find that, except for the crash, plaintiff performed his
work from home without incident such that it was not unduly
burdensome to defendant for plaintiff to work at home.   Also,
viewing the record in plaintiff's favor, the crash occurred
because of an unanticipated problem with the update resulting
from an outside bug as opposed to plaintiff working from home.
(Docket Entry # 53, ¶ 23).   Finally, in his deposition and
affidavit plaintiff attests to working over 100 hours a week
from home.   (Docket Entry # 53, ¶ 8).   While this number appears
excessive, Cao states in his deposition that he knew plaintiff
was working a significant amount of hours a day from home.
(Docket Entry # 54-4, pp. 18-19).

Taking evidence in the light most favorable to plaintiff,
plaintiff has offered sufficient evidence from which a
reasonable juror could conclude that working from home was a
reasonable accommodation that was not unduly burdensome to
defendant and one that would enable plaintiff to perform the
essential functions of his job.

C.   Discharge Because of Disability

Defendant maintains that it terminated plaintiff not
because of his disability, but for legitimate, non-
discriminatory reasons discussed below in section II.   (Docket

Entry # 41, pp. 13-14).  Moreover, defendant asserts that plaintiff cannot point to any evidence showing a link between plaintiff's disability and termination.  (Docket Entry # 41, p. 13).  Plaintiff simply argues that this element is satisfied because he was terminated from TharpeRobbins.

To establish the final element of a prima facie case, plaintiff must show that defendant "took an adverse employment action against him because of, in whole or in part, his protected disability."  Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005); see also Jones v. Nationwide Life Ins. Co., 696 F.3d at 86.  Massachusetts "[c]ases have employed the phrase 'adverse employment action' to refer to the effects on working terms, conditions, or privileges that are material, and thus governed by the statute, as opposed to those effects that are trivial and so not properly the subject of a discrimination action."  King v. City of Boston, 883 N.E.2d 316, 323 (Mass.App.Ct. 2008).

In the case at bar, plaintiff clearly suffered an adverse employment action because he was terminated from TharpeRobbins. The issue thus reduces to whether the termination resulted, at least in part, because of his disability.

At his deposition, Cao, when asked the reasons for plaintiff's termination, responded, "starting with . . . not being in the office consistently."  (Docket Entry # 54-4, p. 33)

41

(ellipses added).  Therefore, a reasonable juror could find that plaintiff was terminated, in part, because of his poor attendance.  (Docket Entry # 54-4, p. 33).  "According to the First Circuit, '[a]sserting that [a] termination was based on [an employee]'s absenteeism rather than her disability does not justify [an employer]'s action where the absence was the requested accommodation.'"  Miller v. Verizon Commc'n, Inc., 474 F.Supp.2d 187, 200 (D.Mass. 2007) (quoting Criado v. IBM Corp., 145 F.3d 437 at 444); see Humphrey v. Mem'l Hosps. Ass'n, 239 F.3d 1128, 1139-40 (9th Cir. 2001) ("[f]or purposes of the ADA, with a few exceptions, conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination").  Here too, the summary judgment record evidences that plaintiff's poor attendance in the office resulted from his disability for which he sought the reasonable accommodation of working from home.  See, e.g., Miller v. Verizon Commc'n, Inc., 474 F.Supp.2d at 200 (denying summary judgment and noting, in context of discussing third prima facie element, that, "[p]laintiff's requested accommodation, a modified schedule, resulted in her being absent").  Therefore, terminating plaintiff, at least in part, because of his poor attendance gives rise to the inference that he was terminated because of his disability.

Taking the evidence in the light most favorable to

plaintiff, this court finds that a reasonable juror could conclude that defendant terminated plaintiff, at least in part, because of his disability.  In sum, plaintiff adequately establishes the prima facie requirements to survive summary judgment with respect to the ADA and chapter 151B claims.

II.  Pretext

Where the employee establishes a prima facie disability discrimination claim, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision and to produce credible evidence to show that the reason advanced was the real reason." Rios-Jimenez v. Sec'y of Veterans Affairs, 520 F.3d at 41.  "If the defendant is able to offer such a reason, the burden then shifts back to the plaintiff to establish that the proffered reason is pretext intended to conceal discriminatory intent." Id.  "The ultimate burden of proving unlawful action rests at all times with [the plaintiff]". Id.

Defendant asserts that even if plaintiff can establish the prima facie elements of a disability claim under the ADA and chapter 151B, defendant made a legitimate business decision because Onorato had a reasonable and good faith belief that plaintiff's performance was deficient.  (Docket Entry # 41, p. 15).  First, defendant asserts that it was plaintiff's responsibility to maintain the reliability and security of the

servers which he failed to do properly, culminating in the server crash on August 13, 2014. (Docket Entry # 41, pp. 15-16). Second, defendant contends that plaintiff failed to complete his objectives for 2013, for example, by failing to fully implement the web application firewall. (Docket Entry # 41, pp. 15-16). Third, defendant argues that plaintiff's poor attendance was also a legitimate reason to terminate him. (Docket Entry # 41, pp. 15-16).[7]

Based on the evidence in the summary judgment record, defendant articulates and the evidence in the record amply supports legitimate, non-discriminatory reasons for terminating plaintiff. The burden, therefore, shifts back to plaintiff to show that defendant's reasons are merely a pretext and, with respect to the ADA claim, that defendant terminated plaintiff in whole or in part because of his disability. Tobin v. Liberty Mut. Ins. Co., 433 F.3d at 105.

Defendant argues that plaintiff's personal opinion unsupported by factual evidence cannot raise an issue of fact on pretext. (Docket Entry # 41, p. 18). Moreover, defendant asserts that Onorato was the ultimate decision maker and plaintiff admits that he never informed Onorato of his depression. (Docket Entry # 41, p. 17). Finally, defendant

---

[7]  Each of these arguments is discussed individually below.

argues that even if it was mistaken in its belief that plaintiff was at fault for the server crash in August 2014, this is not enough to demonstrate that defendant's decision was motivated by discriminatory animus.[8]  (Docket Entry # 41, p. 18).

As correctly asserted by plaintiff (Docket Entry # 59, p. 16), "pretext can be shown by weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions." Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662-63 (1st Cir. 2010).  Furthermore, as also asserted by plaintiff (Docket Entry # 59, p. 16-17), questionable grounds for termination also infer a lack of credence and create an issue of material fact as to whether the grounds were pretextual.  See id.; see also Hodgens v. General Dynamics Corp., 144 F.3d 151, 172 (1st Cir. 1998).

Defendant's first reason for terminating plaintiff was his failure to maintain the security and reliability of the servers. (Docket Entry # 41, p. 15).  Although both parties agree that the crash occurred while plaintiff was updating servers (Docket Entry # 42, ¶ 23) (Docket Entry # 52, ¶ 23), there is a dispute as to who was responsible for the server crash. Defendant argues

---

[8]  As explained below, a showing of pretext alone, i.e., that defendant's reasons were not the real reasons for the termination, is sufficient to avoid summary judgment on the chapter 151B claim.

the crash was plaintiff's fault because it was his responsibility to maintain the security and reliability of the servers.  (Docket Entry # 41, p. 5).  Conversely, as argued by plaintiff (Docket Entry # 59, p. 7), a reasonable juror could find that the crash occurred because of an outside bug (Docket Entry # 53, ¶ 23).

Viewing the facts in plaintiff's favor, the crash would not have occurred had Cao heeded warning that there were holes in the security of the servers.  (Docket Entry # 53, ¶¶ 7, 15-16).  Moreover, had the keys been in the proper file, the system could have been up and running within a matter of hours.  (Docket Entry # 53, ¶ 36).  For purposes of summary judgment only, plaintiff aptly and correctly points out that it was not his job to manage other employees, i.e., Haigh, nor was it his job to maintain the backup files and encryption keys.  (Docket Entry # 54-3, pp. 34-35) (Docket Entry # 53, ¶¶ 29-31).  Plaintiff attests that Haigh deleted the backup files and encryption keys during the installation of an update.  (Docket Entry # 53, ¶ 35).  Furthermore, the record indicates that the servers were restored after plaintiff used the Recuva program to relocate the backup files and the encryption keys.  (Docket Entry # 54-3, pp. 34-35) (Docket Entry # 53, ¶¶ 29-31).  These facts are sufficient to create a genuine dispute of material fact.

Next, defendant argues that plaintiff's termination was based on his failure to complete other projects in 2013, such as the web application firewall which was not fully installed until 2014. (Docket Entry # 41, pp. 15-16). Plaintiff asserts and the record supports another dispute of material fact. At his deposition, Cao testified that the reason plaintiff did not complete his objectives for 2013, which Cao himself set for plaintiff, was because Cao asked plaintiff to prioritize other tasks, which were seemingly more urgent, ahead of plaintiff's primary objectives. (Docket Entry # 54-4, p. 25). Moreover, plaintiff attests that he completed all of his objectives for 2013 despite having to prioritize more urgent matters above these objectives. (Docket Entry # 53, ¶ 8). Plaintiff further attests that the reason he was unable to install the web application firewall was because the software had bugs that the designer of the product was not able to resolve. (Docket Entry # 53, ¶ 6). Viewing the record as a whole and resolving disputed facts in plaintiff's favor, a genuine issue of material fact exists as to whether plaintiff completed his objectives for 2013 sufficient to discount defendant's reason as pretextual.

The third reason defendant provides for plaintiff's termination is his regular tardiness, absences and leaving work early without permission. (Docket Entry # 41, pp. 15-17). With respect to the absences and late arrivals during Onorato's

tenure, the record allows a reasonable juror to find that plaintiff's disability, namely, his depression, caused him to arrive late, not return from lunch a number of times and take days off. (Docket Entry # 42, ¶ 20) (Docket Entry # 52, ¶ 20). Cao admitted that he knew the time plaintiff was taking off was a result of the divorce. (Docket Entry # 54-4, p. 42). At his deposition, Cao stated that beginning around the time of the divorce in November 2012 he noticed plaintiff began taking more time off with short notice. (Docket Entry # 54-4, p. 42). Notably, Cao also testified that plaintiff "wasn't taking any absences for which he didn't have PTO already allocated" and that this remained true up until the date of his termination in September 2014. (Docket Entry # 54-4, p. 42).

Plaintiff attests that he informed Cao of his depression on at least two separate occasions. (Docket Entry # 53, ¶ 3). The first occasion was in November 2013 when plaintiff came to Cao's office and told him he had been diagnosed with depression as a child and continued taking medication for it. (Docket Entry # 45, ¶ 36). The second occasion, which Cao disputes took place, happened in spring/summer 2014 after plaintiff's divorce when he told Cao that the divorce was the biggest personal crisis of his life and, as a result of his worsening depression, plaintiff would need to work from home. (Docket Entry # 54-4, p. 43). Plaintiff admits that he did not inform Onorato of his condition

(Docket Entry # 42, ¶ 31) (Docket Entry # 52, ¶ 31), but attests in his affidavit that he told Cao about his worsened depression and his need to work from home.  (Docket Entry # 53, ¶ 3). Viewing the evidence in the light most favorable to plaintiff, he therefore informed Cao of his severe depression and his need to work from home.

"Limitations that result from a disability that affect the employee's performance of the essential functions of the job may have to be reasonably accommodated." Crevier v. Town of Spencer, 600 F.Supp.2d 242, 254-255 (D.Mass. 2008).  As previously explained albeit admittedly addressing the third prima facie case element, the Miller court recognized that in the First Circuit "'[a]sserting that [a] termination was based on [an employee]'s absenteeism rather than [his] disability does not justify [an employer]'s action where the absence was the requested accommodation.'" Miller v. Verizon Commc'n, Inc., 474 F.Supp.2d at 200 (internal citation omitted).  When the employer knows of an employee's disability, "'conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination.'  This rule includes excessive absenteeism related to the disability." Trujillo v. United States Postal Serv., 330 F.App'x 137, 139 (9th Cir. 2009)

(internal citation omitted) (unpublished);[9] <u>Yarberry v. Gregg Appliances, Inc.</u>, 625 F.App'x 729, 740 (6th Cir. 2015);[10] <u>see</u> <u>also</u> <u>McInteer v. Ashley Distrib. Servs.</u>, 40 F.Supp.3d 1269, 1285-86 (C.D.Cal. 2014) ("[i]t is undisputed that Plaintiff's absences resulted from his disability and thus are considered part of the disability.  By citing his absences as a basis for termination, Defendants ipso facto cited his disability").

Accordingly, plaintiff has sufficiently created a genuine issue of material fact as to each alleged legitimate, non-discriminatory reason proffered by defendant for which plaintiff could have been terminated.  Plaintiff is also correct in stating that Massachusetts is a pretext-only jurisdiction. (Docket Entry # 59, pp. 16-17).  In particular, "an employee may survive summary judgment by producing evidence 'that the respondent's facially proper reasons given for its action against him [or her] were not the real reasons for that action,' even if that evidence does not show directly that the true reasons were, in fact, discriminatory."  <u>Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.</u>, 50 N.E.3d 778, 794 (Mass. 2016) (internal citation omitted); <u>Haddad v. Wal-Mart Stores, Inc.</u>, 914 N.E.2d 59, 66 (Mass. 2009).

---

[9]  <u>See</u> Fed.R.App.P. 32.1; 9th Cir. R. 36-3.
[10]  <u>See</u> Fed.R.App.P. 32.1; 6th Cir. R. 28(f).

The chapter 151B claim, therefore, survives summary judgment. Discriminatory animus in plaintiff's ADA claim, however, is discussed in the following section.

III. <u>Discriminatory Animus</u>

Defendant argues that plaintiff has not offered sufficient evidence of a discriminatory animus. (Docket Entry # 41, p. 9). First, defendant reasons that neither Cao nor Onorato-the ultimate decision maker-has ever showed any discriminatory animus toward plaintiff. (Docket Entry # 41, p. 12). Second, defendant argues that the temporal proximity between when plaintiff told Cao of his disability in November 2013 and the date of termination on September 2, 2014 is insufficient to establish discriminatory animus. (Docket Entry # 41, pp. 16-17). Plaintiff argues that Cao was aware of plaintiff's disability and that he wished to terminate what he perceived to be a disabled employee. (Docket Entry # 59, pp. 18-19).

Unlike chapter 151B, an ADA claim requires that plaintiff show "'that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus.'" <u>Jones v. Walgreen Co.</u>, 679 F.3d at 21 (internal citation omitted). This is separated into a two-step analysis: whether "(1) the employer's given reason for the employment decision is a pretext; and (2) [whether] the true reason is discriminatory animus." <u>Salgado-Candelario v.</u>

51

Ericsson Caribbean, Inc., 614 F.Supp.2d 151, 173 (D.P.R. 2008).
As discussed in the previous section, plaintiff has satisfied
the first element.  The second element, however, requires
further analysis.

As explained by the First Circuit in Hodgens, in assessing
discriminatory motive, a court may consider:

> factors, including "among other things, 'the historical
> background of the . . . decision'; 'the specific sequence
> of events leading up to the challenged decision';
> 'departures from the normal procedural sequence'; . . .
> '[any] contemporary statements by members of the
> decisionmaking body, and substantive departures . . .,
> particularly if the factors usually considered important by
> the decisionmaker strongly favor a decision contrary to the
> one reached.'"

Hodgens v. General Dynamics Corp., 144 F.3d at 168-69; see
Walker v. City of Holyoke, 523 F.Supp.2d 86, 105 (D.Mass. 2007).
In addition, as defendant correctly asserts, "chronological
proximity does not by itself establish causality."  Wright v.
CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); accord Gil v.
Vortex, LLC, 697 F.Supp.2d 234, 243 (D.Mass. 2010).

Plaintiff's argument, that Cao was aware of his disability,
is insufficient to prove discriminatory animus.  "'[T]he mere
fact that an employer is aware of an employee's impairment is
insufficient to demonstrate either that the employer regarded
the employee as disabled or that the perception caused the
adverse employment action.'"  Rivera-Mercado v. Scotiabank de
Puerto Rico-International, 571 F.Supp.2d 279, 287 (D.P.R. 2008)

(citation omitted).  It is nevertheless "true that 'evidence constituting a prima facie case along with evidence of pretext can defeat summary judgment provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action.'"  Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 452 (1st Cir. 2009); Cornwell v. Dairy Farmers of Am., Inc., 369 F.Supp.2d 87, 106 (D.Mass. 2005).

Under the circumstances, it is also appropriate to "heed[] the First Circuit's warning that courts should exercise caution before granting summary judgment for employers on such issues as pretext and motive."  Miller v. Verizon Commc'n, Inc., 474 F.Supp.2d at 200.  "The reason for such caution . . . is 'because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent.'"  Id. (internal citation omitted).

This court finds that a reasonable juror could infer that the unlawful discrimination was a determinative factor in the adverse employment action.  Plaintiff has sufficiently established all the elements of a prima facie case and has created a genuine issue of material fact as to each of defendant's non-discriminatory reasons for terminating plaintiff.  Plaintiff has shown that defendant had knowledge of his disability and terminated him, at least in part, for poor

attendance which resulted from his disability.  Considering the entire record, plaintiff has sufficiently established discriminatory animus for purposes of summary judgment only and, as such, the ADA claim (Count III) survives.

### CONCLUSION

In accordance with the foregoing discussion, defendant's motion for summary judgment (Docket Entry # 40) is **DENIED** as to Count II for disability discrimination in violation of chapter 151B and Count III for disability discrimination in violation of the ADA.  The deadline to file dispositive motions has passed and there shall be no extensions.  This court will conduct a status conference on November 28, 2016 at 2:45 p.m. to set a trial date.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge